[Civ. No. 1475.    Third Appellate District.—August 28, 1916.]

GRANT FEE, Respondent, v. McPHEE COMPANY (a Corporation) et al., Appellants.

ACCOUNT STATED—ESSENTIALS OF—NEW CONTRACT.—An account stated is a writing which exhibits the state of account between parties and the balance owing from one to the other; and when assented to, either expressly or impliedly, it becomes a new contract.

ID.—ACTION FOR SERVICES—SUPPORT OF FINDINGS.—In this action to recover an alleged balance due for services in superintending the con-

struction of certain buildings for a contracting company, it is held that the finding that the document upon which the plaintiff relied as an account stated constituted such an account is supported by the evidence.

ID.—OPENING OF ACCOUNT—FRAUD OR MISTAKE.—In the absence of allegation and proof of fraud or mistake which taints the entire contract, the court will not open and unravel it as if no accounting had been made, but the settlement will be binding except for the errors shown.

ID.—EVIDENCE—PROOF OF OMISSIONS. AND ERRORS.—In an action upon an account stated it is proper to allow evidence of omissions and errors therein and find in favor of plaintiff in accordance with the facts.

ID.—INTEREST—ALLOWANCE FROM COMMENCEMENT OF ACTION.—In an action on an account stated, interest is allowable from the date of the commencement of the action.

ID.—SUPERINTENDENCY OF BUILDINGS FOR CORPORATION—PERCENTAGE OF PROFITS—STATUS OF PARTIES.—Contracts between a corporation engaged in the general contracting business and an individual who is to superintend the construction of certain buildings for the former for a percentage of the "net profits" do not make the relationship of the parties that of partners.

ID.—CONSTRUCTION OF TERM "NET PROFITS"—EVIDENCE.—Evidence of similar contracts made between the parties is admissible to assist the court in interpreting the term "net profits."

APPEALS from judgments of the Superior Court of the City and County of San Francisco and orders denying a new trial.   E. P. Morgan, Judge.

The facts are stated in the opinion of the court.

William P. Hubbard, for Appellants.

Aitken & Aitken, R. H. Countryman, and Frank W. Aitken, for Respondent.

CHIPMAN, P. J.—Two actions between the same parties are included in the appeal, one having been numbered in the court below 17,022, the other 18,032, both having been tried together.   The transcript on appeal covers 1,292 printed pages and the briefs comprise half as many more.   The appeals are by defendants from the respective judgments and from orders denying their motions for new trials made in each case, and

354 alleged errors of law are specified in the assignments of errors.

The complaint in the first action, No. 17,022, was filed June 6, 1908. It is therein alleged that defendant McPhee Company was a corporation organized and existing under and by virtue of the laws of California, with its office and principal place of business in the city and county of San Francisco; that defendants Daniel McPhee and Anna McPhee were at all times husband and wife; that defendant Daniel, during all the times mentioned, was doing business under the name and style of McPhee Company; that defendants sued fictitiously as First Doe, Second Doe, and Third Doe were the owners of one share each, and defendants Daniel and Anna McPhee were the owners of 248½ shares each of the capital stock of said corporation, the entire issued capital stock being five hundred shares; "that said defendants other than the defendants sued herein as stockholders of the defendant McPhee Company are indebted to this plaintiff in the sum of $13,649.27 upon and as for and upon an account stated made by and between said defendants except said defendants sued herein as stockholders and this plaintiff." It is then alleged that "said defendants other than those who are sued as stockholders of said defendant corporation within two years last past . . . entered into written agreements with this plaintiff from time to time, by which it was agreed that in the course of the erection and construction of certain buildings, this plaintiff should act as the superintendent thereof and receive forty per cent of the net profits of the erection and construction of said buildings"; that plaintiff performed his part of said contracts and from time to time received various sums of money on account thereof; that on May 28, 1908, plaintiff and defendants "other than said defendants sued as stockholders" entered into an account stated and the amount of the indebtedness to plaintiff was fixed at the sum of $13,649.27, which said defendants promised to pay; that no part thereof has been paid, and that said stockholders are liable for their proportionate amount of said indebtedness.

In a second count of the complaint it was stated "that this plaintiff performed certain work and rendered certain services to defendants other than said defendants sued herein as stockholders of the defendant corporation," and that plaintiff was to receive forty per cent of the net profits received for the

construction of said buildings;. that the said profits thereof were $65,229.56; that forty per cent thereof is $25,991.82; that plaintiff has been paid $12,342.45, leaving due him the sum of $13,649.27. The prayer is for the last-mentioned sum, judgment being asked against the five stockholders named for their proportionate amounts.

A demurrer to the complaint was overruled and defendants, other than those fictitiously named, answered: Denied that Daniel McPhee "was doing business under the name and style, or name or style, of McPhee Company, otherwise or at all except under the name of McPhee Company, a corporation"; denied that defendant Anna was the owner of any greater number of shares of the capital stock of said corporation than ten shares; denied the indebtedness sued for; denied that they entered into written agreements with plaintiff by which it was agreed that plaintiff should act as superintendent of the construction of the buildings referred to and should receive forty per cent of the net profits thereof; denied performance by plaintiff of the conditions of the contracts alleged; denied making an account stated and that any amount of indebtedness was fixed. The averments of the second cause of action were specifically denied.

The trial commenced on November 17, 1909, and, before its conclusion and on December 1, 1909, an amended complaint was filed, containing two counts. The allegations were the same as in the original complaint, with these exceptions: W. M. Willett, J. F. Campbell, and W. E. Lowe were substituted as defendants for First Doe, Second Doe, and Third Doe; it was alleged that defendant Daniel McPhee was the owner of 483 shares and defendant Anna McPhee of ten shares of the capital stock of said corporation; that the account stated was for $13,749.27 and that one hundred dollars had been paid thereon; the amount alleged in the second cause of action to be due was $15,649.27 and judgment was prayed for that amount.

A demurrer to the amended complaint was overruled and an answer was filed with similar denials as those contained in the answer to the original complaint.

On April 6, 1910, an amendment to the answer was filed, setting up two additional further and separate defenses, in the first of which it was alleged that in any account stated between

the parties, mistakes, errors, and omissions were made therein by the bookkeeper who prepared "such alleged account stated," and that it showed only gross profits and losses," the items being enumerated and aggregating $14,544.59 "as appearing in favor of the plaintiff herein." It was also alleged, as a further and separate defense, that both counts of the complaint were barred by the provisions of subdivision 1, section 339, of the Code of Civil Procedure.

On April 1, 1912, plaintiff filed an "amendment to amended complaint" to be added to the first count, setting up a mistake by the bookkeeper by which five thousand dollars of the net profits made by the defendant corporation were omitted from the account upon which plaintiff was to receive forty per cent, "and if said account stated had expressed said real intention of plaintiff and the defendant corporation, said account would have shown an additional five thousand dollars of net profits, and said account should and would have been stated for the correct sum due plaintiff, to wit: the sum of $15,749.27." A denial of these allegations was filed by defendants.

The complaint in action No. 18,032, filed July 31, 1908, contained similar averments to those set up in the original complaint in action No. 17,022, alleging an indebtedness of $1,123.78, for which amount judgment was asked. An amended complaint was filed December 1, 1909, containing the same changes as made in the amended complaint filed in the other action on the same date. Answers were filed to both pleadings, denying the material allegations thereof.

Very full findings were filed in each action. A nonsuit was granted as to the defendant Daniel McPhee, doing business under the name of McPhee Company. The judgment in action No. 17,022 was in favor of plaintiff against the corporation for the sum of $14,491.33, with interest from the date of the commencement of the action, the aggregate being $18,529.15; judgment was also entered against defendant Daniel McPhee for $17,899.17, and against defendant Anna McPhee for $370.56. In action No. 18,032, the judgment against the corporation, including interest from the commencement of the action, was $1,427.78; against defendant Daniel for $1,379.20, and against defendant Anna for $28.54.

As is apparent from the pleadings, the corporation defendant McPhee Company was engaged in the general contracting

business in San Francisco and plaintiff was its superintendent of construction. Six written agreements were entered into by the plaintiff and defendant corporation which were received in evidence and marked, respectively, exhibits 1 to 6. Exhibit 1 was as follows:

"San Francisco, Cal., April 1/05.

"This is to certify that Grant Fee is entitled to 40% of the net profits on our contract, Fairmont Hotel dated, Jan. 13/05, salaries and office expenses to be charged to the contract.

"All money allowed Grant Fee during construction to be charged against his 40%, on settlement at completion of the contract.

"McPhee Company,
"D. McPhee, Pres't."

Exhibit No. 2 was as follows:

"San Francisco, Cal., Nov. 3/05.

"This is to certify that Grant Fee is entitled to 40% of the net profits of our contract, Deming Building, located on the South East corner of Post and Stockton St., S. F.

"Should there be a loss on the building it is agreed that 40% of the net loss on the Deming Building, is to be deducted from Grant Fee's share of the profits on our contract, Fairmont Hotel, dated Jan. 13/05." (Same signatures as to Exhibit No. 1.)

Exhibit No. 3, dated June 25, 1906, certified that plaintiff was entitled to forty per cent of the net profits on seventeen specified contracts.

Exhibit No. 4 was dated December 1, 1906, covered three separate contracts and contained the following clause: "Should there be a loss on any of the above named contracts it is agreed that Grant Fee is to assume 40% of such loss the same to be deducted from his share of the profits."

Exhibit No. 5, dated April 18, 1907, covered four separate contracts and contained a clause in the same words and figures as last above quoted.

Exhibit No. 6, dated September 28, 1907, covered two contracts and provided that in case of loss on said contracts, "Grant Fee is to stand 40% of said loss same to be deducted from his share of profits on other work."

Appellants, in their opening brief, urge the following general points as demanding reversal of the judgments:

1. There was no account stated.

2. Interest was allowable only from the date of judgment.

3. The judgment rendered was for forty per cent of gross profits and not for forty per cent of net profits.

4. The contracts created the relation of a partnership or joint undertaking between plaintiff and defendant corporation.

5. The court erred in its rulings during the trial.

6. The court erred in other particulars in its findings.

The court found that the defendant corporation entered into written agreements with plaintiff by which it was agreed that in the course of the construction of certain buildings plaintiff should act as superintendent thereof and receive therefor forty per cent of the net profits arising from the construction of said buildings, and that plaintiff performed all the terms and conditions of said agreement on his part to be performed, and there became due plaintiff various sums as his proportion of said net profits; that said proportion at the commencement of the action amounted to the sum of $67,334.46, and that said forty per cent of said net profits amounted to the sum of $26,933,78, of which plaintiff has been paid $12,442.45, leaving due and owing to plaintiff from defendant corporation the sum of $14,491.33, no part of which has been paid; that on May 30, 1908, plaintiff and defendant made and agreed to an account stated of said indebtedness due to plaintiff, and as a result of said accounting the amount of the net profits of defendant on said buildings and the construction thereof was shown to be $65,288.43, and defendants' indebtedness to plaintiff, after charging all debits against him, was fixed and stated to be the sum of $13,749.27, and it was then and there so agreed between plaintiff and defendant, and defendant thereupon promised and agreed to pay plaintiff the said sum of $13,749.27; "that in said account stated and in the making thereof, mistakes, errors, and omissions were made, by which mistakes, errors, and omissions net profits amounting to $2,046.03 made by the defendant corporation McPhee Company in the erection and construction of said buildings upon which plaintiff was to receive forty per cent of the net profits, was omitted from said account," and said account, through said errors, did not represent the real intention of plaintiff and defendant; that said errors were made by the defendants'

bookkeeper in erroneously adding up a certain column of figures contained in what defendant called the "Cost Book," showing the sum of money expended by defendant in said work, and through said error there was set down as expenditures the sum of five thousand dollars more than the true sum; that by reason of the mistake as to the said sum of five thousand dollars, or, rather, with certain other mistakes, errors, and omissions of said bookkeeper, the said net profits were in fact $2,046.03 in addition to said $65,288.43, the total net profits being $67,334.46, and the correct amount of net profits due plaintiff should be and is the sum of $14,491.33.

The court found adversely to all the errors, omissions, and mistakes alleged in the answer to have occurred in stating the account, to wit, items in respect of salaries, office expenses, interest, insurance, use of donkey-engine, and as to these the court found that none of said items was "omitted from said account stated in making up said account stated through mistake, error, or omission of said plaintiff and defendant corporation McPhee Company, or through the mistake, error, or omission of the bookkeeper of said defendant corporation," except "the court has allowed $809.00 for insurance and given the defendant corporation credit therefor in ascertaining the net profits as hereinbefore found, and in finding the additional net profits which should have been allowed to the plaintiff in making said stated account." The court also found that defendant's bookkeeper did in fact figure the office expenses to be one thousand eight hundred dollars, which sum is the correct sum and was charged for office expenses in making said account stated. The court also found that neither cause of action was barred by the statute of limitations.

As conclusions of law, the court found the plaintiff was entitled to judgment as we have hereinabove stated.

We shall address ourselves to the principal action (No. 17,022 in the superior court), in which judgment for the larger amount, $18,529.15, was rendered. No question arises as to the ownership of the shares of defendant corporation, ninety-seven per cent of which belonged to defendant D. McPhee—he and his wife owning over ninety-eight per cent of the five hundred shares; nor is there any question as to his authority, as president and manager of the corporation, to represent and act for it during all the time plaintiff was con-

nected with it. There had been no meeting of the stockholders or directors for years, its business being carried on by McPhee. The corporation, in fact, represented his business incorporated. Our reference, when made to the defendant, will mean the corporation.

1. One of the principal questions in the case is whether or not the finding that there was an account stated is supported by the evidence. The account was introduced as exhibit 7, and is as follows:

"San Francisco, May 28/08, 190

M

Statement of McPhee Co. with Grant Fee.

To McPhee Company, Dr.

Contractors

| Mill and Yard: | | Telephone |
|---|---|---|
| 1308 to 1350 Sixteenth Street | | Market 449 |
| 1908 | Profit | |
| Borel Bank ....................$7140.93 | | |
| Pacific Union Club ............. | 29.75 | |
| | $7170.93 | |
| 40% ......................... ......$2868.27 | | |

Nov 17/09
First Page
E P.M.J.

Feb 22/08

Statement of account between McPhee Co.
& Grant Fee.

| | Profit | Loss |
|---|---|---|
| 1906 | | |
| To Fairmont Hotel ................$23810.80 | | |
| Deming ............. ............ | | $4326.53 |
| Newhall, Folsom St. ............... | 3506.84 | |
| Halleck St. ....................... | 3095.20 | |
| Pope Estate, Front St.............. | | $974.63 |
| Pope Estate, Mission St............. | 2536.42 | |
| Irwin residence, | | |
| Galvanized iron & sidewalk.......... | 371.70 | |
| Forward ....... ......... | 32320.96 | 5301.16 |

|  |  |  |
|---|---:|---:|
| Forward ................ ........ | $32320.96 | $5301.16 |
| Bush St. ........................ | 2418.17 | |
| Aronson Bldg. scaffolding .......... | 212.87 | |
| Repair work ..................... | 5291.18 | |
| Lick job ......................... | 34.30 | |
| Brick work, Call ................. | 2835.92 | |
| Call Powerhouse, brick............. | 1622.18 | |
| "          floors ............ .. | 1932.15 | |
| J. D. Spreckels ................... | 78.46 | |
| Borel fence, etc. ................. | 9.50 | |
| Sash & frames, Call ............... | | 1865.95 |
| Halleck St. underpinning........... | 138.99 | |
| Dunphy residence ................. | 106.87 | |
| Cunningham ..................... | 19069.42 | |
| Office work ...................... | | 1800.00 |
|  | $67070.97 | $8967.11 |
| Less loss, .............. | 8967.11 | |
| Net profit, .............. | $58103.86 | |
| Net profit........$58103.86 | | |
| 40 %......... .........| $23241.54 | |
| Cash rec'd to & including | | |
| 2/21/08 ................ ..... | 10710.00 | |
|  | $12531.54 | |

Nov 17–09
Second page
E P M. J.

|  |  |  |
|---|---:|---:|
| May 23/08 | | |
| Transformer house ............... | 47.95 | |
| Manhole ...... .............. | 11.17 | |
| Call Powerhouse, floor.......... | | 29.35 |
| "          brick, ......... .... | | 75.00 |
|  | 59.12 | 104.25 |
|  | | 59.12 |
|  | | 45.23 |

O.K.
A.M.G.

| | |
|---|---|
| Balance, Feb 21/08............... | $12531.54 |
| Loss,......$45.23 | |
| 40%..... ........... ...........ı | 18.09 |
| | $12513.45 |
| Cash rec'd to & including 5/23/08..ı | 1632.45 |
| O. K. McPHEE....... | $10881.00'' |

The notations, "Nov. 17/09 First page E P M. J" and "Nov. 17/09 Second page E P M. J.," were made by his Honor Judge Mogan at the trial.

The notation, "O.K. A. M. G.," on second page was placed there by defendant's bookkeeper, Mrs. Goodspeed. Otherwise than the notation made by Judge Mogan, the account is as it was handed to plaintiff by the bookkeeper.

It will be observed that there are two pages comprising this account, each initialed by the trial judge. The one spoken of in the testimony as the "second page" is signed: "O.K. McPhee." This account covers transactions concerning the contract made April 1, 1905, in relation to the Fairmont Hotel, and ending February, 1908, the account having been first stated February 22, 1908.

The "first page," so called, brings the account down to May 28, 1908. This page was not signed by McPhee. The facts as to the preparation of the account and its signing by McPhee were given in the testimony of plaintiff and of Mrs. Goodspeed, who was the defendants' bookkeeper. Plaintiff testified that he asked the bookkeeper to make a statement of the profits and losses on the different jobs in which he was associated or had superintended and the moneys drawn by him and the moneys due him; that she made the statement in writing and gave it to plaintiff, showing the account down to February 21, 1908; that he gave the paper to McPhee between the 1st and 10th of March. He testified: "I told him this was the statement made up by the bookkeeper, showing the profits and losses on the different jobs, the amount of money drawn by me, and the amount of money due me at this date. . . . He took the paper and said that he would look it over''; that McPhee retained it in his possession until the other account ("first page") was handed him more than two months later; that at plaintiff's request the bookkeeper continued the account down to May 23d, 1908, showing the profits and losses

and moneys drawn to that date; that this continuation was a carbon copy of the prior statement which had been handed to McPhee; that on May 28, 1908, the bookkeeper prepared a further statement as to two buildings—the Borel Bank and Pacific Union Club—just completed; that this statement was pinned to the prior statement, the two constituting what is referred to as plaintiff's exhibit 7; the carbon copy of the February account with its continuations, being the portion referred to as "second page," and the subsequent account constituting what is referred to as the "first page." He testified that on May 30, 1908, he gave McPhee "the carbon copy of that same paper and the extension brought down and the other business pinned onto it." "Q. Were they attached together with a pin? A. At that time; yes, sir. Q. And the papers were in the same condition then as they are now, as to figures, totals, etc.? A. Yes, sir. Q. Was that written in lead pencil on that second page 'O.K. McPhee?' A. He placed that on there that day."

As to what occurred at that time, he testified: "I handed the paper to Mr. McPhee, and told him that was a statement of the profits and losses on the jobs, and the moneys that I had drawn, and what was due me to date, and that Mrs. Goodspeed did not want to put this amount to my credit on the books without he first O.K.'ed the statement. . . . Mr. McPhee took the paper and he looked it over for a little while and O. K.'ed the paper and signed his name to it and handed it to Mrs. Goodspeed, and told her that was all right, to place it in the books."

Mrs. Goodspeed testified, "I saw Mr. Fee on that occasion hand this paper to Mr. McPhee; that paper, plaintiff's exhibit 7, as near as I can remember, was, at that time, in its present condition and I think both pinned together. As near as I can remember, Mr. Fee said: 'Mr. McPhee,' he says, 'here is a statement of the profits and losses and the balance due me as far as I know.' . . . The Court: Q. Did Mr. McPhee look at the paper? A. Yes, sir. Mr. Aitken: Q. Then what? A. He looked at it quite a few minutes, and then he said: 'That is all right, Grant.' Q. Did he sign it? A. I saw him sign it. . . . Q. Did he say to you, asking about putting it in the books to Mr. Grant Fee's credit? A. I turned around to Mr. McPhee, and I said: 'Mr. McPhee, will I put this in the books?' and he said, 'Yes.'"

She testified that McPhee handed the paper to her with this instruction and that later she gave it to plaintiff.

Both before and after this account was stated as plaintiff testified, he had been demanding from McPhee money on account for the purpose of building a house and also to make a contemplated trip east, and these demands amounted to nine thousand dollars; that McPhee made frequent promises to meet his demands, but put him off to await a payment due or soon to become due on the Call Building. "The Court: Q. At that time he had in his possession, and there was due you, you claim, eleven-odd thousand dollars? A. Yes, sir. The Court: Q. But you were only asking a certain sum on account? A. Yes, sir."

After plaintiff commenced the action, plaintiff met McPhee at the latter's request. Plaintiff testified: "Mr. McPhee wanted to know why I had brought suit. I told him I was unable to get the money that was due me; he had promised repeatedly and I could not succeed in getting any of it, and I brought suit to protect myself; that I needed the money and wanted it. . . . He said he owed me the money, but he did not have the money just then. . . . There was no question about his owing me the money. . . . He and I conceded that there was this amount due me of $13,000 and some odd dollars." Later they met me in the office of John R. Aitken, one of plaintiff's attorneys, to talk over the matter. Mr. Aitken testified quite fully to what was said in his office by the parties. Among other things, he testified: "Mr. Fee used words like these: 'You owe me this money; why don't you pay it? Why don't you keep your word?' Mr. McPhee said: 'Well, I owe the money, I know I owe you the money,' or words to that effect, substantially that he owed the amount of money we had sued for. I am trying to give you almost the exact words used by Mr. Fee and Mr. McPhee. . . . Substantially it was this: Mr. Fee said: 'You owe me this money;' and Mr. McPhee said he owed the amount of money that we had sued for. . . . I used the words, stating the amount, $13,649, and Mr. McPhee said that he owed the amount but that he did not have the money and would give his notes at fifteen, thirty, and sixty days for it without security, and I advised Mr. Fee not to accept the offer. . . . The Court: Q. Was the amount mentioned in the

conversation, or was the claim mentioned? A. The amount was mentioned in the conversation, I know."

It is not necessary to state more of the testimony to show that McPhee knew the contents of the exhibit 7 and the amount therein stated as the balance due plaintiff and the amount plaintiff claimed to be due him.

We think, also, that this exhibit 7 was what the law regards as an account stated. In *Mercantile Trust Co.* v. *Doe,* 26 Cal. App. 246, 256, [146 Pac. 692], we had occasion to say: "To turn an account into an account stated, it must have been rendered with a view of ascertaining the balance and making a final adjudication of the matter involved in the account; or, in other words, to bring about a meeting of the minds of the parties." That this is precisely what was effected in the case here seems to us plain enough.

In *Gardner* v. *Watson,* 170 Cal. 570, [150 Pac. 994], the supreme court very recently said: "Over what in law constitutes an account there was never any question in this state, and very little uncertainty exists in other states."

Quoting from *Baird* v. *Crank,* 98 Cal. 293, 297, [33 Pac. 63], the court said: "It must appear that at the time of the accounting certain claims existed, of and concerning which an account was stated; that a balance was then struck and agreed upon, 'and that defendant expressly admitted that a certain sum was then due from him as a debt' "; and as was said in *Coffee* v. *Williams,* 103 Cal. 556, [37 Pac. 504]: "An account stated is a document—a writing—which exhibits the state of account between parties and the balance owing from one to the other; and when assented to, either expressly or impliedly, it becomes a new contract." (See 1 Ruling Case Law, p. 207, tit. "Accounts and Accounting.")

We need to go no further into the books to warrant the finding of the court that the document here in question was an account stated.

2. Appellants contend that the account was opened up by proof of mistakes, errors, and omissions, and hence it ceased to be an account stated. Defendants' bookkeeper testified that the account was stated from entries in what were called "Cost Books," in which were entered all the items of receipts and disbursements relating to the contracts with plaintiff, as had been done in agreements not now involved, but similar previous transactions which had been carried on by the same

parties and had been closed up in the same manner. She testified that after this account had been stated she discovered that in adding the column showing expenditures on the Fairmont Hotel, she had made a mistake of five thousand dollars which affected the profits to that extent on that contract, and made a difference in plaintiff's balance of two thousand dollars. She also discovered some other minor mistakes, both debits and credits, resulting in $46.03 more to pass to plaintiff's balance.

"In the absence of allegation and proof of fraud or mistake which taints the entire account, the court will not open and unravel it as if no accounting had been made, but the settlement will be binding except for the errors shown." (1 Corpus Juris, p. 721.)

We held in *Adams* v. *Gerig,* 25 Cal. App. 638, 640, [145 Pac. 106], that it was proper for the court, in an action for an account stated, to allow evidence of omissions and errors therein and find in favor of plaintiff in accordance with the facts.

*Johnson* v. *Gallatin Valley Milling Co.,* 38 Mont. 83, [98 Pac. 883], was a case where an account was stated in relation to an invoice of wheat sold by plaintiff to defendant. A balance was struck and plaintiff signed at the bottom a receipt in full payment. He afterward discovered that there was a shortage in the number of bushels and in the true balance due, to his disadvantage, and he demanded of defendant to make the correction, which being refused, he brought the action to surcharge the account stated. Said the court: "The rules of law applicable to such cases as the present, wherein one of the parties seeks to avoid the settlement and reopen the account, are simple and of easy application. The balance ascertained from a statement of accounts was formerly held to be the result of so deliberate an act by the parties as to preclude an examination into the items for the purpose of correcting errors or mistakes; but this rule has been so far relaxed that, while the promise to pay the ascertained balance is in effect a new promise, the settlement being regarded as the consideration for it, the settlement does not create an estoppel, but furnishes a strong *prima facie* presumption that the result is correct." (Citing cases.)

It was held that the burden of proof is cast upon the party seeking to avoid this new promise and open up to investigation the antecedent dealings between the parties, and he must allege the error, mistake, or fraud on which he relies and establish it by clear and satisfactory evidence. (See, also, note to *Jasper Trust Co.* v. *Lampkin,* 136 Am. St. Rep. 48.)

It was in obedience to this rule that defendant sought to surcharge the account and introduced evidence of what it regarded as errors, omissions, and mistakes.

3. At this point we may dispose of defendant's contention that it was error to find against it in these particulars. The precise point urged is that the judgment rendered was for forty per cent of gross and not forty per cent of net profits, and this because it failed to take into account certain items which defendant contends should have been considered.

Defendant devotes much attention to the cases and text-writers on the question of what constitutes net profits as contradistinguished from gross profits, and the rule by which they are to be ascertained, but he deduces the conclusion that the term "net profits" used in the contracts necessarily implies that the items claimed by defendant should have been included as expenditures, thus reducing proportionately the net profits on the several contracts. Defendants' position might find support were this an accounting of the general business of the corporation between persons mutually interested in such general business, which it is not. There were six separate contracts, each referring to a particular building or buildings, or to particular work at certain places. There was no necessary connection between any two or more of them except as provided in the contracts themselves. Expressly in some and impliedly in others, there was by the terms of the contracts to be a settlement at the completion of each contract. Forty per cent of the net loss in the Deming Building (No. 2) was to be deducted from plaintiff's share of the profits on the Fairmont Hotel contract. No. 3 embraced the Newhall Building and "the net profits on repair work" at certain designated places, and plaintiff was to be allowed his profits "on settlement at completion of the contract and work." No. 4 mentions the second Newhall Building, the Pope Estate Building, and certain work on the Claus Spreckels Building, and the contract provided

that "should there be a loss on any of the above named contracts, it is agreed that Grant Fee is to assume 40% of such loss, the same to be deducted from his share of the profits." No. 5 contained a similar provision as to the work therein provided for, that is, plaintiff was to share losses in any of the work therein mentioned. In No. 6, the Borel Building, and brick work on the Call power-house, the contract reads: "Should there be a loss on the above named work, it is agreed that Grant Fee is to stand 40% of said loss, same to be deducted from his share of profits on other work."

Whether the terms "other work" referred to work mentioned in that contract or in all others is not clear. It is not very material, since in preparing the stated account the bookkeeper took up the work from the beginning and entered the profits and losses on each, and struck a balance, thus giving defendant the benefit of all losses. But the contracts show and the evidence was that plaintiff had nothing to do with the other business of the corporation or enterprises in which it was engaged, or in the private enterprises or business of McPhee outside of the corporation which amounted to a large sum and absorbed most of McPhee's time. The testimony of the bookkeeper and of plaintiff was that the account was made from entries in defendant's books showing the receipts and disbursements—the profits and losses—connected with each contract and building and piece of work constructed or performed under it. Mrs. Goodspeed testified that she was then and had been bookkeeper for defendant for about six years. She testified: "I keep a ledger, journal, cash-book, and the cost books; they are the books of the McPhee Company." She testified that she "kept the accounts of the receipts, expenditures, and disbursements relating to those buildings [referring to the six different contracts] in the cash-books of the McPhee Company," and that she made up the document—plaintiff's exhibit 7—and that it represented "the profits and losses shown on the books at that time. . . . That is the summary of the accounts as kept by the McPhee Company in the cost-book. . . . Q. That is the way you kept the account of these jobs in the cost book? A. Yes."

Speaking of one of these cost books, and it seems there were several of them, the witness said: "The book I have

in my hand is the cost book of the McPhee Company, No. 5. The cost of the various buildings and work done by the Mc-Phee Company was kept in the journals and ledgers and the cost books. The items were first entered in the journal and ledger, and in the cost book right afterward.'' This cost book No. 5 contained the items as to the Lowe Building, which the witness gave in detail as she did as to the other buildings of which entries were made in other cost books commencing with cost book No. 1. For example, cost book No. 1 contained the items as to the Deming Building—a twenty-one thousand dollar job, in which the loss was over four thousand dollars, charged against plaintiff. Cost book No. 2 contained the items as to the Newhall, Folsom, and most jobs on which there was a net profit, and some other jobs; this book also contained the items as to the New-hall Halleck Street job and the Pope Estate job. Cost book No. 3 contained the Pope Mission Street job, Irwin residence, Bush Street job, Aronson Building, and other jobs. No. 4 contained items of repair work. The items of all these jobs were read into the record ''as shown by the books of the company.'' The witness testified the date the work mentioned in the contracts ''was completed so far as the McPhee Company was concerned on the 23d day of May, 1908,'' and the amount of money drawn by plaintiff on the various jobs, which, as appeared by the ledger, was $12,385.10 and $157.35 merchandise.

4. We cannot pursue the testimony as to the character and purpose of these cost books. It showed that they were kept with the view of recording just what the parties to the contracts meant should be in them, and what they intended were to be considered in ascertaining the receipts and expenditures from which were to be computed the net profits of the work called for. Some time after this action was begun, Mr. McPhee employed an accountant to examine the books and make a summary of the net profits after there had been written into these cost books by McPhee's direction certain items aggregating $36,334.31, the principal item being McPhee's salary as defendant's president and manager at $1,000 per month, amounting to fifty-five thousand dollars, of which he directed $29,633.33 to be distributed upon a proportion fixed by himself among the numerous jobs

embraced in these six contracts. This distribution was entirely arbitrary, as it was in respect of the charges for warehouse and storage, rent, caretaker, interest, and use of a donkey-engine, for it was not possible to say what part of any one of these items was justly chargeable to any particular contract. There was no evidence explaining why, during the period these contracts were running, none of these items had been carried into the cost books, nor was there any evidence that this omission was by mistake. The books had been kept in this way for years, and Mrs. Goodspeed received her education and instruction in bookkeeping from her predecessor, who kept the books under McPhee's directions prior to Mrs. Goodspeed's employment. Some of the items which McPhee directed to be entered in the books, notably his salary, had never before appeared on the books in any form or been considered in any settlement with plaintiff for his services. There never had been, as was shown by the minutes of the corporation, any agreement made by the directors to pay him a salary, or authority given him to charge for his services as president and manager. He knew the system under which his books were being kept and he knew that the items he caused to be entered in the books after the action had been commenced were items never before considered in previous settlements, and had not been entered at any time during the two or three years these contracts were in force. He had in his possession for two months the stated account as first shown him and, presumably, did what he told plaintiff he would do, namely, "look it over." He approved it as presented to him again, with some additions to cover later jobs, and subsequently, and after suit brought, admitted the indebtedness there shown. The burden was on him to show that, through mistake, the account did not include the items he now claims should have been entered on the cost books. He did not meet this burden.

These books were, in fact, so far as they went, duplicates of the journal entries and were placed in the cost books at the same time. Their only office seems to have been to furnish in separate books in convenient form the various items constituting receipts and expenditures relating to the contracts here involved and from which the profits and losses on the contracts could be readily ascertained.

We think the facts and circumstances shown justified the court in rejecting the items written into these books by McPhee's direction after the action was commenced and accepting the cost books as the correct source of the stated account.

5. It is claimed that interest was improperly allowed from the commencement of the action, and should have been, if at all, from the date of the judgment.

Section 1917 of the Civil Code provides: "Unless there is an express contract in writing, fixing a different rate, interest is payable on all moneys at the rate of seven per cent per annum after they become due, on any instrument of writing, except a judgment, and on moneys lent, or due on any settlement of account, from the day on which the balance is ascertained. . . ."

Section 3287 provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt."

The general rule is that interest is chargeable on a stated account from its date. (*De la Cuesta* v. *Montgomery,* 144 Cal. 115, [77 Pac. 887] ; 22 Cyc. 1511, 1515.)

Where the action is for general damages, or liquidated, or *quantum meruit,* or *quantum valebat,* for the recovery of the reasonable value of goods sold and delivered or services rendered, interest is allowable only from the date of the judgment under the code rule. Here the demands were for "moneys due on settlement of account" and "the balance ascertained" and agreed to as witnessed by the stated account (Civ. Code, sec. 1917) ; and we think interest was recoverable because the damages were "certain, or capable of being made certain by calculation." (Civ. Code, sec. 3287.) Even under some circumstances, interest may be allowed in an action upon a contract for unliquidated damages. (*Courteney* v. *Standard Box Co.,* 16 Cal. App. 600, 615, [117 Pac. 778].)

The following cases would seem to warrant the charge for interest from the commencement of the action: *McCowen* v. *Pew,* 18 Cal. App. 482, 487, [123 Pac. 354] ; *Lane* v. *Turner,*

114 Cal. 396, [46 Pac. 290]; *Cutting Fruit Packing Co.* v. *Canty,* 141 Cal. 692, 697, [75 Pac. 574]; *Macomber* v. *Bigelow,* 126 Cal. 9, [58 Pac. 312]; *Farnham* v. *California etc. Trust Co.,* 8 Cal. App. 268, 273, [96 Pac. 788].

6. It is further contended that the contracts created the relation of a partnership or joint undertaking between plaintiff and defendant. It is hence claimed that there could be no action other than a suit for an accounting. The pleadings nowhere raise this issue. Ordinarily, in the absence of special authority, a corporation cannot enter into partnership with a private person (10 Cyc. 1142, 1143), and no such authority was shown. A corporation may enter into a contract by which it is agreed that the gains and losses of the venture shall be borne equally (*Bates* v. *Coronado Beach Co.,* 109 Cal. 162, [41 Pac. 855]), but such agreements do not necessarily make the parties partners in legal contemplation.

The question here does not involve the question of partnership as affecting third parties. *Kennedy & Shaw Lumber Co.* v. *Taylor,* 3 Cal. Unrep. 697, [31 Pac. 1122], cited by defendant, only held that the associates were liable as partners to plaintiff. As between themselves, their rights were not involved. In the case here, plaintiff had no interest in the profits as property; he was simply employed under an arrangement by which he was to receive for his services a given sum out of, or a proportion of, the profits. *Berthold* v. *Goldsmith,* 24 How. 536, [16 L. Ed. 762]: "The general rule is," as was stated in *Jernee* v. *Simonson,* 58 N. J. Eq. 282, [43 Atl. 370], "if there is no community of interest in the property of a business, that there is no partnership *inter sese* by mere participation in the profits."

In *Smith* v. *Schultz,* 89 Cal. 526, [26 Pac. 1087], the agreement was to work a farm upon shares. Speaking of the contract, the court said: "It gives no power to one to bind the others; it contemplates no common liability; it does not make one the agent for the others in carrying on any business whatever; it contains no agreement, either express or implied, for the division of any losses, and there is no intimation in it that plaintiff was to be 'liable to third persons for all the obligations of the partnership jointly with his copartners.' (Civ. Code, secs. 2404, 2429, 2442, 2443.) Nor does it contain any agreement among themselves that the party of the one part

should be bound to any extent for the obligations of the party of the other part. They were not to be partners, therefore, either as to third persons, or *inter sese.*" This case presents many features similar to the one here. (See, also, *Coward* v. *Clanton,* 122 Cal. 451, [55 Pac. 147]; 30 Cyc. 376, 377; *Cudahy Packing Co.* v. *Hibou,* 92 Miss. 234, [46 South. 73, 18 L. R. A. (N. S.) 975, and note, 1032].)

The discussion loses some of its importance in view of the fact that whatever the relation of the parties was, they settled their account with each other and agreed upon the balance due from one to the other.

7. It must not be expected that we can give specific attention to over three hundred and fifty alleged errors. Such an array might give one pause, if each suggested a separate and distinct error. In fact, but few points are involved. For example, after the cost books were identified and the entries explained, as to the different contracts, to each of the hundred or more questions an objection being interposed, plaintiff's counsel would ask the question: "What does the cost book show to be the profits of [naming the job]?" The answer was merely the result of these figures, and was not a conclusion of the witness, and the result was not, as defendant contends, a showing of gross profits; the result clearly was net profits.

8. The motion for nonsuit was directed to this point and was properly overruled. It was discretionary with the court to allow evidence to meet objections made by the motion based on the lack of proof on certain matters. The motion also presented the point that the action should have been in the form of an accounting on the theory that a partnership existed. This point has already been noticed; no partnership was proven.

9. Evidence was admitted that plaintiff and defendant had made similar contracts prior to the ones in the suit. This evidence was objected to. Defendant contended at the trial, and still contends, that these cost books and the profits referred to in the contracts had relation to gross profits and not net profits as claimed by plaintiff. The evidence now urged as inadmissible was introduced to aid the court in viewing the circumstances surrounding the parties, when the contracts were made, and to clear up the situation of the parties at that time

—in short, to put itself in their place. It appeared from the evidence that plaintiff and defendant had been operating from 1901, and up to the time contract No. 1 was made, in a series of jobs not unlike the ones here, and under terms quite similar. In one of them, for example, plaintiff was to receive twenty per cent for his services; in another they were to "divide the profits in half on any work or contracts," and neither of them was to receive a salary, and in all these contracts the McPhee Company was to "finance the jobs." It is true that in the cases where he got fifty per cent, plaintiff was to *procure,* as well as superintend, the jobs, but we cannot see that that affects the question. Plaintiff and defendant had been engaged in doing work for three or four years under substantially the same conditions and circumstances as for the time here involved.

In giving interpretation to their agreement, and to ascertain what they meant by "net profits," it seems to us the court was justified in allowing the evidence. "Previous and contemporaneous transactions may properly be taken into consideration to ascertain the sense in which the parties used particular terms, or to ascertain the subject matter of the contract." (17 Cyc. 671.) The supreme court said, in *First Nat. Bank* v. *Bowers,* 141 Cal. 253, 262, [74 Pac. 856], that "where the meaning of terms is debatable," facts which tend to illustrate or explain the language used in a contract and to place the court or jury as nearly as may be in the situation of the parties, "are always admissible." The courts "may avail themselves of the same light which the parties possessed when the contract was made." (*Merriam* v. *United States,* 107 U. S. 437, [27 L. Ed. 530, 2 Sup. Ct. Rep. 536].)

10. Counsel takes up in his brief each one of these jobs and endeavors to show that the cost books do not correctly exhibit the receipts and disbursements, and hence do not show the net profits. We cannot follow all these intricate details. The bookkeeper testified to the correctness of the accounts in these cost books, and so far as we have been able to analyze the figures and entries upon which her testimony rests, we cannot say she was mistaken.

As we understand the record, the action No. 18,032 involves the same questions *mutatis mutandis* as in No. 17,022, and the decision in the latter covers the decision in the former.

We have endeavored to consider such of defendants' numerous objections as seemed to demand attention, and failing to discover any prejudicial error in the record, the judgments and orders are affirmed.

Ellison, J., *pro tem.*, and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 27, 1916.